UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LOUIS MENDOZA, | ) | NO. CV 04-10058-MAN |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION AND ORDER |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

Plaintiff filed a Complaint on December 9, 2004, seeking review of the denial by the Social Security Commissioner ("Commissioner") of Plaintiff's claim for Disability Insurance Benefits ("DIB").  On January 25, 2005, the parties filed a "Consent to Proceed Before a United States Magistrate Judge," pursuant to 28 U.S.C. § 636.  The parties filed a Joint Stipulation ("JS") on August 23, 2005, in which:  Plaintiff seeks an order reversing the Commissioner's decision and directing the payment of benefits; and Defendant requests that the Commissioner's decision be affirmed.  The Court has taken the parties' JS under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his application for DIB on January 31, 2002. (Administrative Record ("A.R.") 129-35.) Plaintiff claims to have been disabled since April 6, 2001, due to poor hearing and pain in his hands, forearms, right leg, and right knee. (A.R. 129, 142.) Plaintiff has past relevant work experience as a machinist and machine operator. (A.R. 22, 143, 151-54.)

The Commissioner denied Plaintiff's claim for benefits initially. (A.R. 102-05.) Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (A.R. 106-07.) On April 30, 2003, Plaintiff, who was represented by counsel, appeared at a hearing before ALJ Peggy Zirlin. (A.R. 36-100.) On July 19, 2003, the ALJ denied Plaintiff's request for benefits. (A.R. 18-32.) Thereafter, on November 12, 2004, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (A.R. 6-8.)

## SUMMARY OF ADMINISTRATIVE DECISION

In her July 19, 2003 written decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of his disability.[1] (A.R. 31.) The ALJ determined that Plaintiff had "severe" impairments, taken singularly or in combination, consisting of: a history of chronic synovitis of the hands and wrists; a history

---

[1] The ALJ determined that Plaintiff met the nondisability requirements for a period of disability and DIB, and was insured through the date of the ALJ's decision. (A.R. 31.)

2

of right fourth finger, right thumb, and left thumb trigger releases; right knee pain due to a torn meniscus in 1999, osteoarthritis, and chondromalacia; a history of bilateral carpal tunnel surgeries; and a possible diagnosis of fibromyalgia. (A.R. 22, 31.) However, Plaintiff's impairments did not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (A.R. 31.)

The ALJ further found that Plaintiff's complaints of disabling pain generally were not credible. (A.R. 27-29, 31.) She opined that Plaintiff had the following residual functional capacity:

> Regarding [the] right and left thumb[s] and right trigger finger for the period [from] September 2000 to January 2002, [Plaintiff] was restricted [to] no repetitive grasping or fingering of machinery. For the period from January 2002 and onwards, there was a restriction against exposure to vibrations; regarding the right knee, [Plaintiff] is restricted to occasional crawling, climbing ladders, kneeling, and squatting; regarding the hands and wrists and from April 2001 to January 2002, [Plaintiff] was restricted [to] no repetitive grasping or fingering of machinery and from January 2002 and onwards, there was a restriction against exposure to vibrations; regarding lifting and carrying, he was limited to 25 pounds frequently and 50 pounds occasionally; regarding pushing and pulling [with] the upper extremities, [Plaintiff] was slightly restricted bilaterally in upper extremity use of hand controls and cars. He could push/pull low resistence all day, that is 25 pounds or less all day, and more than 25

3

pounds occasionally, that is one-third of a day; regarding standing and walking, from April 2001 to the present, [Plaintiff] could stand four or four-to-six hours out of eight; regarding sitting, he could sit six hours out of eight but might need to juggle the knee up and back while sitting or straightening it out occasionally; with a slight decrease in pushing and pulling activities with the right lower extremity.

(A.R. 31.)

The ALJ concluded that Plaintiff had a "limited education," was an "individual closely approaching advanced age," and had past relevant work experience as a machinist and machine operator.[2]  (A.R. 22, 32, 143.)  Based on her residual functional capacity finding, the ALJ determined that Plaintiff could not perform his past relevant work. (A.R. 31.)  The ALJ found, using Rule 202.11 of the Medical-Vocational Guidelines (the "Grids") as a framework and relying on the testimony of a vocational expert, that Plaintiff could perform work as a counter clerk and fundraiser II.[3]  (A.R. 30, 32.)  Accordingly, the ALJ found that Plaintiff was not "disabled" within the meaning of the Social Security Act.  (A.R. 32.)

---

[2]   Plaintiff was born on March 5, 1952 and was 51 years old at the time of the hearing.  (A.R. 22, 66, 129.)  In addition, Plaintiff had an eleventh grade education.  (A.R. 22, 66, 148.)

[3]   The vocational expert, David Rinehart, testified that a hypothetical individual with Plaintiff's age, education, vocational background, and residual functional capacity could not perform Plaintiff's past relevant work.  (A.R. 94.)  However, Mr. Rinehart opined that the individual could perform other work as a counter clerk and fund raiser II.  (A.R. 92, 94.)

**STANDARD OF REVIEW**

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996).  The Commissioner's decision must stand if it is supported by substantial evidence and applies the appropriate legal standards.  <u>Saelee v. Chater</u>, 94 F.3d 520, 521 (9th Cir. 1996).  Substantial evidence is "more than a mere scintilla but less than a preponderance - it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  <u>Moncada v. Chater</u>, 60 F.3d 521, 523 (9th Cir. 1995).

Although this Court cannot substitute its discretion for that of the Commissioner, this Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion."  <u>Desrosiers v. Sec'y. of Health & Human Servs.</u>, 846 F.2d 573, 576 (9th Cir. 1988); *see also* <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).  This Court must uphold the Commissioner's decision if it is supported by substantial evidence and free from legal error, even when the record reasonably supports more than one rational interpretation of the evidence.  *Id*. at 1039-40; *see also* <u>Morgan v. Commissioner of the Soc. Sec. Admin.</u>, 169 F.3d 595, 599 (9th Cir. 1999); <u>Flaten v. Secretary of Health & Human Servs.</u>, 44 F.3d 1453, 1457 (9th Cir. 1995).

**DISCUSSION**

Plaintiff alleges five issues[4]: (1) Plaintiff contends that the ALJ improperly discounted Plaintiff's subjective complaints; (2) Plaintiff argues that the ALJ improperly rejected the treating psychiatrist's opinion; (3) Plaintiff alleges that the ALJ improperly rejected the treating orthopedist's opinion; (4) Plaintiff contends that the ALJ failed to fully and fairly develop the record; and (5) Plaintiff argues that, if this case is remanded for another hearing, the hearing should be held before a different ALJ.  (JS at 3.)

**A.   <u>The ALJ Failed To Assess Plaintiff's Subjective Testimony Properly</u>.**

Once a disability claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to cause some level of pain of the type which the claimant alleges, the claimant's subjective complaints regarding the severity of her pain may not be discredited based solely on a lack of objective medical evidence to corroborate the extent of the alleged pain.  <u>Smolen</u>, 80 F.3d at 1281-84; <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir. 1991); <u>Fair v. Bowen</u>, 885 F.2d 597, 601 (9th Cir. 1989).  This rule is based on the recognition that pain is an inherently subjective phenomenon, which cannot be objectively verified or measured and varies significantly among individuals.  <u>Bunnell</u>, 947 F.2d at 347.  Unless the evidence suggests affirmatively that Plaintiff is malingering, the ALJ must provide clear and convincing reasons for rejecting Plaintiff's excess

---

[4]    The second, third, and fourth issues will be addressed, collectively, under heading "B."

6

pain or symptom testimony.  <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).

Although the absence of objective medical findings to support the degree of pain cannot be the sole reason to reject subjective complaints, it has been recognized as one valid consideration.  *See* <u>Wainwright v. Secretary of Health & Human Servs.</u>, 939 F.2d 680, 682 (9th Cir. 1991).   Other factors that the ALJ may use to discredit a claimant's subjective complaints include the following: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  <u>Smolen</u>, 80 F.3d at 1284; *see also* <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002)(listing factors including: (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between her testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains)(citing <u>Light v. Social Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997)).

Plaintiff testified that he experiences constant pain in his hands, wrists, and right knee.  (A.R. 70.)  He stated that his hands swell.  (*Id.*)  In addition, Plaintiff claims to have a hearing problem.  (A.R. 70-71.)  Specifically, Plaintiff alleges that he experiences "extremely

7

loud" tinnitus which makes concentrating difficult. (*Id.*) Furthermore, he noted that he cannot wear a hearing aid consistently, because the ringing and hissing in his ears overpower the hearing aid's capability. (A.R. 71.)   Plaintiff also asserts that he suffers from depression. (*Id.*)

Plaintiff testified that he lives with his wife and two children but remains alone at home during the day.  (A.R. 67.) He asserted that he:  goes to a grocery store about "once a week" with his wife, who helps carry the bags; goes to a "mailbox-type place" every few weeks; tries to pick things up around the house and to do some laundry and dishes; sometimes picks up after his three dogs; feeds these dogs dry food, although he does not walk them; and does "a little bit" of cooking, but no yard work.  (A.R. 80-82.)

Plaintiff also alleged that he is able to bathe and dress himself "most of the time."  (A.R. 82.)  In addition, he asserted that, when he is alone, he watches television or listens to the radio.  (*Id.*)  He commented that he tries to read but finds it difficult, because "it is hard to concentrate."  (A.R. 82-83.)

Plaintiff testified that when he drives, he goes to a store, a restaurant, or his daughter's house, which is nearby.  (A.R. 83.) However, he asserted that he and his wife went on a six-week vacation to the Sacramento area in May 2003, in which they both shared the driving duties.  (A.R. 83.)  Plaintiff alleged that he had to stop constantly in order to stretch and rest.  (A.R. 84.)  Specifically, he stated that "sometimes [he would] drive most of the way and [he] might make 10

stops." (*Id.*)  Plaintiff testified that he does not go on such trips often.  (*Id.*)  In fact, his prior long distance trip was to Las Vegas in August 2002.  (A.R. 84-85.)  Plaintiff stated that he did most of the driving during the Las Vegas trip.  (A.R. 85.)  He asserted that, while in Las Vegas, he played slot machines in 15 to 30 minute increments in order to take breaks in-between.  (*Id.*)

Plaintiff opined that he can lift and carry 6 to 15 pounds once and possibly twice.  (A.R. 72.)  He asserted that he has difficulty grasping with his hands.  (*Id.*)  In particular, Plaintiff alleged that when he eats, "sometimes the knife and fork don't stay in [his] hands."  (*Id.*) Moreover, he testified that this happens on a daily basis.  (*Id.*) Plaintiff asserted that tying his shoes is a struggle.  (*Id.*)

In addition, Plaintiff opined that he can comfortably stand for 10 to 15 minutes, walk for about 10 minutes, and sit for about 10 to 15 minutes.  (A.R. 74-75, 77.)  He alleged that his right leg spontaneously "gives out," meaning that the leg "runs out of energy, and becomes hard to lift."  (A.R. 74-75.)  Although his leg "gives out," Plaintiff stated that he cannot use a cane because of the pain in his hands and wrists. (A.R. 76.)  However, he noted that no doctor recommended that he use a wheelchair.  (*Id.*)

As for his mental impairment, Plaintiff testified that he feels depressed, because it is hard for him to accept his physical limitations.  (A.R. 78.)  He stated that he gets agitated easily and "does not want to be bothered by people."  (A.R. 86-87.)  Plaintiff also reported that he feels angry and disappointed that his physical

condition does not improve and consequently, he cannot return to his prior occupation. (A.R. 87-88.) Plaintiff asserted that his medication (*i.e.*, Wellbutrin) sometimes helps in controlling his depression. (A.R. 71.) However, he commented that his medication (*i.e.*, Wellbutrin and an allergy medication) makes him drowsy, which prevents him from performing his daily functions. (A.R. 78-79.)

In rejecting Plaintiff's claimed limitations symptoms, the ALJ explained, in part, as follows:

> [Plaintiff's] subjective complaints and alleged limitations are out of proportion to the objective clinical findings and observed functional restrictions as noted above. There is no evidence of severe disuse muscle atrophy of the upper or lower extremities that would be compatible with his alleged inactivity and inability to function.

> [Plaintiff's] subjective complaints and alleged limitations are not consistent with the treatment he receives. [Plaintiff] has conservative treatment with medication. According to Dr. Bluestone, [Plaintiff] has no treatment other than anti-inflammatory medication and vitamins (Exhibit 23-F). The records do not reflect the extreme medication side effects he claimed at the hearing. [Plaintiff] does not have treatment for his alleged hearing problems. He did not seek psychiatric treatment until his worker's compensation benefits stopped and he was terminated from his job. He only recently started medication and the record does not reflect severe

1    medication side effects.

2

3         [Plaintiff's] activities of daily living are not
4    consistent with the alleged total inability to function
5    physically and mentally.  Dr. Bluestone reported that
6    [Plaintiff] told him that he does housework, runs errands,
7    feeds the dogs, has a regular social life, and drinks 1-to-2
8    times per week (Exhibit 23-F).  [Plaintiff] takes long driving
9    vacations, which is inconsistent with his claim that he cannot
10   use his hands, that his right leg does not function, that he
11   cannot drive because of medication side effects, and that he
12   cannot sit for more than 15 minutes or sit without moving
13   around for more than 1-2 minutes.  His daily functioning is
14   not consistent with the allegation of no useful mental
15   functioning in almost all areas.  [Plaintiff] is alone all day
16   and he drives, travels, and runs errands independently.  He
17   was able to understand the questions put to him and answer
18   them at the hearing.  Dr. Bluestone noted that [Plaintiff] was
19   pleasant and gave a clear history.

20

21   (A.R. 28-29.)

22

23        Plaintiff contends that the ALJ failed to provide clear and
24   convincing reasons for discounting Plaintiff's claimed symptoms.  (JS at
25   4.)  As will be elaborated below, the Court agrees.

26

27        First, the ALJ improperly rejected Plaintiff's testimony based on
28   the lack of objective evidence to support the degree of Plaintiff's

1   claimed limitations.   The ALJ acknowledged that the record contains
2   objective evidence showing impairments that could reasonably cause pain
3   in Plaintiff's hands and right knee.   (A.R. 22.)   However, the ALJ
4   emphasized that "[t]here [was] no evidence of severe disuse muscle
5   atrophy of the upper and lower extremities that would be compatible with
6   [Plaintiff's] alleged inactivity and inability to function." (A.R. 28.)
7   The ALJ thus violated the well-established rule that a claimant's
8   allegations of subjective symptoms cannot be discredited merely because
9   they are not corroborated by objective evidence.   *See* Smolen, 80 F.3d at
10  1281-84.

11

12      Moreover, Plaintiff never testified to a level of inactivity that
13  would result in severe muscle atrophy.   Instead, Plaintiff stated that,
14  although his hands and right knee were weak, he could still perform
15  certain activities (*e.g.*, he went to a grocery store about once per
16  week, goes to a "mailbox-type place" every few weeks, tries to pick
17  things up around the house and do some laundry and dishes, sometimes
18  picks up after his three dogs, feeds his dogs dry food, and does "a
19  little bit" of cooking).   *Cf*. Meanel v. Apfel, 172 F.3d 1111, 1114 (9th
20  Cir. 1999)(affirming the ALJ's rejection of the claimant's testimony of
21  constant pain that required her to lie in a fetal position all day where
22  the ALJ noted that the claimant did not exhibit muscular atrophy or any
23  other physical signs of an inactive, totally incapacitated individual).
24  Thus, the absence of severe muscle atrophy was an improper basis for
25  discounting Plaintiff's subjective allegations.

26

27      The ALJ also improperly concluded that Plaintiff's subjective
28  complaints were not credible in light of his conservative treatment.

Contrary to the ALJ's suggestion that Plaintiff had received no treatment other than anti-inflammatory medication and vitamins, Plaintiff's course of treatment has been extensive and invasive.  For example, Plaintiff has received injections and acupuncture in his hands and right knee.  (*See, e.g.*, A.R. 316 -- in June or July 1999, cortisone was injected into Plaintiff's right knee, and in or about September 2000, cortisone was injected into both of Plaintiff's hands; A.R. 233 -- on April 10, 2001, Plaintiff's right hand was injected with Xylocaine and Depo-Medrol; A.R. 238 -- on May 4, 2001, Dr. Nicholas Rose, Plaintiff's treating orthopedic surgeon, stated that Plaintiff "would [] benefit from repeat cortisone injection to the right trigger thumb and right ring trigger finger"; A.R. 352 -- on September 20, 2001, Dr. Sobol recommended acupuncture, as cortisone shots had only provided temporary relief.)  However, the treatments provided only temporary symptomatic relief.  (A.R. 233, 316, 352.)  Thereafter, Plaintiff underwent right thumb and ring finger trigger releases on November 8, 2001.[5]  (A.R. 317, 321, 324-29.)

Plaintiff continued to complain of pain after the surgical procedure.  (A.R. 286, 313-14, 321-23, 421-25, 432.)  In addition, progress notes dated December 21, 2002, and November 26, 2002, indicate that physical therapy performed after the surgery has, at best, provided only temporary relief.  (A.R. 390-91.)  Furthermore, the record indicates that Plaintiff was allergic to codeine.  (A.R. 333, 350, 337.)

---

[5]   In addition, in or about 1985, Plaintiff received bilateral carpal tunnel release.  (A.R. 182, 204-05, 234).  Plaintiff also received a left thumb trigger release in 1996.  (A.R. 234, 349.) However, on February 20, 2003, Plaintiff declined surgery to his right knee.  (A.R. 419.)

Given the extensive treatment Plaintiff has received thus far, the fact that Plaintiff did not take stronger medication fails to meet the standard of constituting "clear and convincing" reason for discrediting Plaintiff's pain testimony.

Additionally, Plaintiff's failure to seek psychiatric treatment until after his termination from his employment and the termination of worker's compensation benefits was not inconsistent with Plaintiff's subjective complaints.  Psychological tests administered by Plaintiff's treating psychiatrist, Dr. Thomas Curtis, indicate that Plaintiff was defensive about admitting to his depression.  (A.R. 446.)  Hence, Plaintiff's delay in seeking psychiatric help could be reasonably explained by his reluctance to admit to his depression.  *See* Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996)(an ALJ may not discredit a treating physician based on the claimant's lack of treatment for depression because "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation")(quoting Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989)).

Furthermore, Plaintiff's activities of daily living were not inconsistent with Plaintiff's subjective pain allegations.  The ALJ found that Plaintiff's admission of taking long driving vacations was inconsistent with his claim that:  he could not use his hands; his right leg did not function; he could not drive because of medication side effects; and he could not sit for more than 15 minutes or sit without moving around for more than one to two minutes.  (A.R. 29.)  The ALJ's finding was an improper characterization of Plaintiff's activities and

14

1   physical capabilities.

2

3        First, Plaintiff did not claim that "he [could not] use his hands."
4   Rather, he testified that, although he had difficulty grasping with his
5   hands, he was able to do certain activities which required the use of
6   his hands, such as grocery shopping about "once a week" with the help of
7   his wife, going to a "mailbox-type place" every few weeks, doing "some
8   laundry" and "some dishes," "sometimes [picking] up after the dogs,"
9   feeding the dogs, doing "a little bit" of cooking, and bathing and
10  dressing himself. (A.R. 72, 80-82.) Second, Plaintiff did not assert
11  that "his right leg [did] not function." Instead, Plaintiff stated that
12  his right leg "[gave] out" spontaneously, meaning it "[ran] out of
13  energy, and [became] hard to lift." (A.R. 74-76.) Third, Plaintiff did
14  not testify that "he [could not] drive because of medication side
15  effects." Rather, Plaintiff asserted that the medication made him
16  drowsy, and when drowsy, he "[did not] feel like driving." (A.R. 79.)
17  Fourth, Plaintiff testified that long distance trips forced him to stop
18  constantly, in order to take breaks. (A.R. 84.) He asserted that, on
19  a long trip, "sometimes [he would] drive most of the way [but] might
20  make 10 stops." (A.R. 84.) Furthermore, he stated that he did not go
21  on long distance trips often. (*Id.*) In fact, Plaintiff's last trip
22  prior to the aforementioned May 2003 trip was a Las Vegas trip in August
23  2002. (A.R. 84-85.)

24

25       Given a correct summary of Plaintiff's physical abilities and
26  activities, the ALJ failed to show that they were inconsistent. *See*
27  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998)(rejecting an
28  adverse credibility finding premised on the claimant's ability to

perform daily activities, when the level of activity was not inconsistent with her claimed limitations).  Furthermore, the fact that Plaintiff could go on infrequent long distance trips, during which he required constant stops in order to rest, was not reflective of Plaintiff's ability to perform work activities on an ongoing and daily basis.  *See* <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1201 (9th Cir. 1990)(daily activities may not be relied upon to support an adverse credibility decision where those activities do not affect the claimant's ability to perform appropriate work activities on an ongoing and daily basis); <u>Fair</u>, 885 F.2d at 603 (noting that a claimant is not required to be "utterly incapacitated" in order to be disabled and that "many home activities are not easily transferable to what may be the more grueling environment of the workplace").

The ALJ's finding that Plaintiff's daily functioning was inconsistent with Plaintiff's allegations of "no useful mental functioning in almost all areas" was similarly unavailing.  In particular, the ALJ noted that Plaintiff:  was alone all day; was able to drive, travel, and run errands independently; was able to understand questions and answer them at the hearing; and gave a clear history and was pleasant to Dr. Rodney Bluestone.  (A.R. 29.)

Plaintiff never testified that he had "no useful mental functioning in almost all areas."  Rather, Plaintiff asserted that he: felt depressed because he found it difficult to accept his physical limitations; got agitated easily; and "[does not] want to be bothered by people."  (A.R. 78, 86-87.)  The correct summary of Plaintiff's testimony of his mental impairment was not inconsistent with Plaintiff's

daily functioning.  *See* <u>Reddick</u>, 157 F.3d at 722.  The ALJ also failed to show how Plaintiff's ability to perform these basic activities translated to his ability to perform work activity.  *See* <u>Gonzalez</u>, 914 F.2d at 1201.

Thus, the ALJ did not provide clear and convincing reasons for her rejection of Plaintiff's testimony, and her conclusion that Plaintiff was not credible did not rest on substantial evidence.

**B.   <u>The ALJ Improperly Rejected The Treating Physicians' Opinions, And The Record Must Be Further Developed Regarding Plaintiff's Mental Limitations</u>.**

Generally, the opinions of treating physicians are given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant.  <u>Smolen</u>, 80 F.3d at 1279; <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)(citing <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1230 (9th Cir. 1987)).  Although the treating physician's opinion is entitled to great deference, it is not necessarily conclusive as to the question of disability.  <u>Magallanes</u>, 881 F.2d at 751 (citing <u>Rodriquez v. Bowen</u>, 876 F.2d 759, 761-62 (9th Cir. 1989)).  Where the treating physician's opinion is uncontradicted, it may be rejected only for "clear and convincing" reasons.  <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995)(as amended).  Where the treating physician's opinion is contradicted, the ALJ may reject it in favor of a conflicting opinion of an examining physician if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence

17

in the record.    <u>Ramirez v. Shalala</u>, 8 F.3d 1449, 1453-54 (9th Cir. 1993).

Plaintiff contends that the ALJ failed to provide legally sufficient reasons for rejecting the opinion of the treating psychiatrist. (JS at 13.)  In addition, Plaintiff argues that if the ALJ concluded that the evidence from the treating psychiatrist was not clear and satisfactory, the proper response was to obtain development of the record, not to reject Plaintiff's claim. (JS at 30.)  Plaintiff also alleges that the ALJ failed to provide legally sufficient reasons for rejecting the opinion of Plaintiff's treating orthopedist. (JS at 21.)

1. **<u>The ALJ Improperly Rejected The Treating Psychiatrist's Opinion, And The ALJ Must Develop And Clarify The Record Regarding Plaintiff's Mental Impairment</u>.**

Dr. Curtis was Plaintiff's treating psychiatrist since December 2002. (A.R. 442.)  On December 11, 2002, Dr. Curtis performed a detailed psychological evaluation, which included a mental status examination and multiple psychological tests, such as a Beck Depression Inventory, Beck Scale for Suicidal Ideation, Neuroticism Scale Questionnaire, and Minnesota Multiphasic Personality Inventory-2. (A.R. 442-54.)  Thereafter, Dr. Curtis diagnosed Plaintiff with depressive disorder (not otherwise specified) with anxiety and psychological factors affecting Plaintiff's medical condition (*i.e.*, stress-intensified dental problems, paraspinal muscle tension/pain, and arthritic-type pain and possible fibromyalgia in the upper body). (A.R.

18

1    448.)

2

3        Dr. Curtis noted that Plaintiff exhibited abnormal behavior with

4    manifestations of emotional withdrawal and ill-composed and depressive

5    facial expressions.  (A.R. 448.)  In addition, Plaintiff was found to be

6    beset by stress-aggravated pain and disability, withdrawn, insecure,

7    depressed,    anxious,    confused,    overwhelmed,    and    emotionally

8    dysfunctional.  (A.R. 449.)  Dr. Curtis opined that Plaintiff needed to

9    work through emotional complications with the passage of time and needed

10   supportive psychotherapy before returning to any occupation.  (*Id.*)

11   Thereafter, Plaintiff was found to be temporarily totally disabled.[6]

12   (*Id.*)   Dr.  Curtis  concluded  that  Plaintiff  should  be  provided

13   psychotropic  medication,  evaluation,  and  management.   (A.R.  450.)

14   However, Plaintiff declined treatment with medication.  (*Id.*)

15

16       On February 20, 2003, Dr. Curtis completed a Mental Impairment

17   Questionnaire.  (A.R. 433-38.)  He assessed Plaintiff with a Global

18   Assessment of Functioning score ("GAF") of 45.[7]  (A.R. 433.)  Dr. Curtis

19   _____

20       [6]    Dr. Curtis noted that, he could not estimate, on a psychiatric
21   basis, a return-to-work date for regular or modified work.  (A.R. 450.)
     Furthermore, he opined that he could not yet determine whether Plaintiff
22   would eventually be emotionally able to return to his prior work.  (*Id.*)
     Although the residuals of permanent emotional impairment, if any, were
23   not known, Dr. Curtis opined that substantial residuals of permanent
     emotional impairment were likely to exist.  (*Id.*)

24       [7]    A GAF score is the clinician's judgment of the individual's
25   overall  level  of  functioning.   It  is  rated  with  respect  only  to
     psychological, social, and occupational functioning, without regard to
26   impairments in functioning due to physical or environmental limitations.
     See American Psychiatric Association, Diagnostic and Statistical Manual
27   of Mental Disorders, 32 (4th ed. 2000)(hereinafter "DSM IV").

28       A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal
     ideation, severe obsessional rituals, frequent shoplifting) OR any

opined that Plaintiff: would be slightly restricted in his activities of daily living; would have moderate difficulties in maintaining social functioning; would often have deficiencies of concentration, persistence, or pace, resulting in the failure to complete tasks in a timely manner; and would have continual episodes of deterioration or decompensation in work or work-like settings which cause him to withdraw from that situation or to experience exacerbation of signs and symptoms.[8] (A.R. 437.) Dr. Curtis noted that Plaintiff's treatment included group therapy once a week and medication management (*i.e.*, Wellbutrin SR 150 mg once a day). (A.R. 434-35.) Dr. Curtis concluded that Plaintiff's

---

serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV at 34.

[8] Dr. Curtis also opined that Plaintiff's ability to perform work-related activities was "fair" (*i.e.*, seriously limited, but not precluded) in the following areas: understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; set realistic goals or make plans independently of others; interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar place; and use public transportation. (A.R. 436-37.) Additionally, Dr. Curtis found that Plaintiff's ability to perform work-related activities was "poor or none" (*i.e.*, no useful ability to function) in the following areas: remember work-like procedures; maintain attention for two hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number of or lengthy rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; understand, remember, and carry out detailed instructions; and deal with the stress of semiskilled and skilled work. (*Id.*)

impairment could be expected to last at least 12 months.[9]  (A.R. 435.)

The ALJ found that Dr. Curtis's assessments were not credible, because of "the minimal treatment Plaintiff [was] given, the lack of any hospitalization, and [Plaintiff's actual] daily functioning [were] not consistent with a GAF of 45 or almost no useful ability to function." (A.R. 27.)  The ALJ also noted that Plaintiff did not start medication treatment until March 2003.  (*Id.*)  The ALJ opined that "the record [did] not reflect that with compliance with appropriate treatment, there [would] be a severe mental impairment for twelve continuous months." (*Id.*)

Dr. Curtis was the only mental health physician who proffered a medical source statement as to Plaintiff's psychological condition.  As Dr. Curtis's opinion was not contradicted, the ALJ was required to give "clear and convincing" reasons for rejecting Dr. Curtis's opinion.  *See* Lester, 81 F.3d at 830.  Plaintiff contends that the ALJ failed to provide such reasons.  (JS at 17.)  In addition, Plaintiff contends that, if the ALJ concluded that the evidence from Dr. Curtis was not satisfactory, the proper response was to obtain further development of the record, not to reject Plaintiff's claim.  (JS at 31.)  The Court agrees with both contentions.

First, Dr. Curtis's prescribed treatment was not inconsistent with his GAF assessment of 45 (*i.e.,* serious impairment in social,

---

[9]   Dr. Curtis also stated that he would be able to assess Plaintiff's prognosis in three months, after further treatment.  (A.R. 435.)

21

occupation, or school functioning).  Dr. Curtis opined that Plaintiff should attend group therapy sessions once a week and should take psychotropic medication.  (A.R. 450.)  Such treatment suggests that Plaintiff had a "serious" mental impairment.  The fact that the prescribed medication was of low dosage (*i.e.*, Wellbutrin SR 150 mg once a day) does not diminish Dr. Curtis's credibility, as he may have reasonably initiated the medication treatment in a progressive manner, starting with weaker medication and adjusting thereafter.  Similarly, nothing in the record supports the ALJ's conclusion that, because Plaintiff was not hospitalized, Plaintiff did not suffer a significant mental impairment.

In addition, the fact that Plaintiff did not start medication until March 10, 2003, or about one and a half month prior to the hearing, was not a "clear and convincing" reason for rejecting Dr. Curtis's opinion.  (A.R. 27.)  It is unclear whether the ALJ stated this fact to insinuate that Dr. Curtis prescribed medication shortly before the hearing to portray Plaintiff as more disabled than Dr. Curtis believed.  To the extent that the ALJ make such an implication, the ALJ erred.

Following his initial evaluation of Plaintiff on December 11, 2002, Dr. Curtis opined that Plaintiff should be treated with medication.  (A.R. 450.)  Plaintiff, however, initially refused to undergo such treatment.[10]  (*Id.*)  Plaintiff eventually agreed, while revealing his

---

[10]     As noted above, psychological tests administered by Dr. Curtis revealed that Plaintiff was probably defensive against admitting to his depression.  (A.R. 446.)

fear of such a course of treatment.[11]  (A.R. 424, 429-30.)  Dr. Curtis's immediate recommendation, upon his first evaluation of Plaintiff, that medication treatment be provided, suggests that Plaintiff may have a "severe" mental impairment.

The ALJ also failed to explain how Plaintiff's daily functioning was inconsistent with Dr. Curtis's assessments.  (A.R. 27.)  As noted above, Plaintiff testified that he felt depressed, because he found it difficult to accept his physical limitations.  (A.R. 78.)  He stated that he becomes agitated easily and "[does want] to be bothered by people."  (A.R. 86-87.)  Moreover, he testified that his mood is "irritable most of the time."  (A.R. 86.)  Plaintiff asserted that he: goes to a grocery store approximately once a week; goes to a "mailbox-type place" every couple of weeks; tries to do laundry, wash dishes, and pick up things around the house; does a "little bit" of cooking; bathes and dresses himself "most of the time"; spends time with his wife and children; watches television or listens to the radio when he is alone; has difficulty reading because it is "hard to concentrate" due to the ringing and hissing in his ears; and drives short distances to a store, a restaurant, or his daughter's house.  (A.R. 80-83.)

The ALJ failed to explain how these activities were inconsistent with Dr. Curtis's assessments.  The generalized statement that "[Plaintiff's actual] daily functioning [was] not consistent with a GAF of 45 or almost no useful ability to function" (A.R. 27), failed to

---

[11]    Plaintiff agreed to undergo medication treatment on February 10, 2003, and was subsequently provided medication on March 10, 2003. (A.R. 424, 429.)

constitute a "clear and convincing" reason for rejecting a treating physician's uncontroverted opinion.[12]

Finally, the ALJ incorrectly concluded that "the record [did] not reflect that with compliance with appropriate treatment, there [would] be a severe mental impairment for twelve continuous months." (A.R. 27.) The record is bereft of any evidence indicating that appropriate treatment would stabilize Plaintiff's mental condition.[13] It was error for the ALJ to substitute her own diagnosis for that of Dr. Curtis. *See* Tackett v. Apfel, 180 F.3d 1094, 1102 (9th Cir. 1999); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975)(an ALJ is forbidden from making his own medical assessment beyond that demonstrated by the record).

Although the ALJ improperly rejected Dr. Curtis's opinion, the proper weight, if any, to be given to Dr. Curtis's findings cannot be determined without further development of the record.  In his February 20, 2003 Mental Impairment Questionnaire, Dr. Curtis asserted that he would not be able to render an opinion on Plaintiff's prognosis until after three months of further treatment. (A.R. 435.) Moreover, in his initial evaluation administered on December 11, 2002, Dr. Curtis reported that "it would not yet be possible to estimate the residuals of permanent emotional impairment, if any." (A.R. 450.)  He noted, however, that "it would appear likely that there will be substantial

---

[12]    Moreover, a GAF of 45 does not denote "almost no useful ability to function" but rather indicates a "serious impairment in social, occupational, or school functioning." *See* DSM IV at 34.

[13]    Plaintiff testified that the medication helped sometimes. (A.R. 71.)

residuals of permanent emotional impairment." (*Id.*)   Dr. Curtis's
abstention from providing a prognosis on Plaintiff's mental health
renders his opinion inadequate for determining the extent of Plaintiff's
mental impairment.   Therefore, further development of the record is
needed to determine the extent and duration of Plaintiff's mental
impairment.   *See* <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-60 (9th Cir.
2001)(stating that an ALJ's duty to develop the record is triggered by
ambiguous or inadequate evidence in the record); *see also* <u>Tonapetyan v.</u>
<u>Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001)(an ALJ in a social security
case has an independent duty to fully and fairly develop the record and
to assure that the claimant's interests are considered, even when the
claimant is represented)(citing <u>Smolen</u>, 80 F.3d at 1288).

To the extent the ALJ desires to reject Dr. Curtis's opinion and
find Plaintiff to have a non-severe mental impairment, the ALJ should
base her decision on an acceptable medical source.   *See* 20 C.F.R. §
416.913(a)(1) (a decision regarding a claimant's medically determinable
impairments should be based upon a determination made by an "acceptable
medical source," such as a licensed physician).   Here, the ALJ inferred
that Plaintiff's mental impairment would improve with medication and,
therefore, concluded that Plaintiff did not have a severe mental
impairment for twelve continuous months.   (A.R. 27.)   However, Dr.
Curtis, the only physician to have assessed Plaintiff's mental
limitation, did not make such an assessment.   As the record is
inadequate to support such a conclusion, the ALJ should further develop
the record by ordering a consultative examination of Plaintiff's mental
health.   *See* <u>Mayes</u>, 276 F.3d at 459-60.   Thereafter, the ALJ should
weigh both opinions according to the proper legal standards in rendering

her decision.

The ALJ's reasons for rejecting Dr. Curtis's opinion were not supported by substantial evidence in the record.  The ALJ should further develop the record in regard to Plaintiff's mental limitations by re-contacting Plaintiff's treating psychiatrist and ordering, if necessary, a consultative examination.  On remand, the ALJ should ensure that the record is fully developed and accurately reflected in her findings regarding Plaintiff's treating psychiatrist's opinion, and the ALJ must provide reasons, if they exist, for discrediting the psychiatrist's opinion that are "clear and convincing" in accordance with the requisite legal standard.

### 2. **The ALJ Improperly Rejected The Treating Orthopedist's Opinion.**

Dr. Philip Sobol, an orthopedic surgeon, has been Plaintiff's treating physician since January 2, 1997.[14]  (A.R. 403.)  On March 27, 2003, Dr. Sobol completed a Physical Residual Functional Capacity Questionnaire, in which he diagnosed Plaintiff with numerous ailments including:  right knee patellofemoral arthralgia with bursitis and medial meniscal tear; post-operative right thumb and ring finger trigger releases; and bilateral wrist/forearm tendinitis with a history of bilateral carpal tunnel release and left thumb trigger release.  (*Id.*)

---

[14]   Dr. Sobol was Plaintiff's primary treating physician from January 2, 1997, to February 7, 1997, for injuries to Plaintiff's feet, hands, and ears.  (A.R. 403.)  Thereafter, Plaintiff received treatment from Drs. Thomas Kim and William Kim.  (A.R. 316.)  However, since September 20, 2001, Dr. Sobol returned as Plaintiff's primary treating physician for injuries to his hands and right knee.  (A.R. 403.)

He opined that Plaintiff:  could walk 1 to 2 blocks without rest; could continuously sit for 30 minutes for a total of about 2 hours in an 8-hour workday; could continuously stand for 15 minutes for a total of less than 2 hours in an 8-hour workday; required 5 minutes of walking around for every 15 minutes of work; required the option to shift positions at will from sitting, standing, or walking; required the option to take unscheduled breaks for 5 to 15 minutes for every 30 to 60 minutes of work; could occasionally lift and carry less than 10 pounds but nothing over that weight; could use his hands for grasping, turning, and twisting objects for 10% of an 8-hour workday; could use his fingers for fine manipulations for 5% to 10% of an 8-hour workday; should avoid all exposure to extreme cold or extreme heat; should avoid even moderate exposure to high humidity, chemicals, solvents/cleaners, and soldering fluxes; and may be absent from work more than three times per month. (A.R. 406-08.)

In support of his findings, Dr. Sobol noted:  an abnormal MRI scan of Plaintiff's right knee; examination of Plaintiff's right knee revealing decreased motion (*i.e.*, flexion was 125/135 and extension was 180/180), swelling, patellofemoral crepitus, positive McMurray sign for medial joint line pain, and palpable pain over medial joint line; and examination of Plaintiff's bilateral wrists/hands showing decreased motion, decreased Jamar grip strength, multiple post-operative scars, decreased pinch strength, spasm of the wrist extensor muscle bellies bilaterally, and palpable pain over the dorsal capsules and IP (interphalangeal) and MCP (metacarpophalangeal) joints of both thumbs. (A.R. 409.)

In rejecting Dr. Sobol's opinion, the ALJ stated:

I cannot give Dr. Sobol's assessment controlling weight or greater weight than Dr. Gurvey's assessment, although Dr. Sobol is [Plaintiff's] worker's compensation advocate doctor, because that assessment is not supported by the objective findings in the record as a whole and is not consistent with the other functional assessments.   Dr. Sobol cites few objective findings or observed functional limitations as support for his assessment, yet cites numerous subjective complaints in support.   Dr. Sobol assesses restrictions that are not correlated to any objective findings or observed limitations in either his records or the other records in the medical file.   I give greater weight to Dr. Gurvey's assessment because of the inconsistency between the extreme limitations found only by Dr. Sobol, who is [Plaintiff's] paid medical advocate, and the other doctors in the record, and between those of Dr. Gurvey which are consistent with the other medical assessments.   Dr. Gurvey is an orthopedic specialist who is an objective third party[,] who has no personal or financial stake in the outcome of [Plaintiff's] worker's compensation or Social Security claims.   Dr. Sobol is [Plaintiff's] advocate for worker's compensation and his job is to support the claim for such benefits as well as Social Security benefits.   Dr. Sobol relies almost solely on the subjective complaints as support for his extreme limitations, complaints that I find are not fully credible.   Nevertheless, as Dr. Gurvey testified, he considered Dr. Sobol's records and

28

functional assessment when giving his opinion.   Further, although Dr. Sobol finds an inability to do sedentary work, he gives only minimal conservative treatment.   That level of treatment is not consistent with the alleged extreme limitations he assessed.   Accordingly, I accept and adopt Dr. Gurvey's findings and opinions.

(A.R. 26.)

Plaintiff contends that the ALJ failed to reject Dr. Sobol's opinion for proper reasons.   (JS at 21.)   In particular, Plaintiff argues that the ALJ improperly dismissed Dr. Sobol's opinion, because Dr. Sobol was Plaintiff's "advocate" for worker's compensation.   (JS at 23.)

The ALJ's suggestion that Dr. Sobol may be biased in favor of Plaintiff, because he was Plaintiff's "advocate" for worker's compensation, is not a legitimate reason for rejection.   The record contains no evidence indicating that Dr. Sobol's professional relationship with Plaintiff compromised his medical assessments.   *See* Reddick, 157 F.3d at 725-26 (holding that the ALJ erred in assuming that the treating physician's opinion was less credible, because his job was to be supportive of the patient).

In addition, the ALJ improperly rejected Dr. Sobol's opinion based on her conclusion that Dr. Sobol's findings of extreme limitations relied almost solely on subjective complaints, which the ALJ found were

not fully credible.  As discussed above, the ALJ failed to discredit properly Plaintiff's testimony.  Thus, the basis for the ALJ's rejection of Dr. Sobol's opinion was not supported by the record and, therefore, was not "legitimate."  *See* <u>Andrews</u>, 53 F.3d at 1043 ("[A]n opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded, <u>once those complaints have themselves been properly discounted</u>.")(emphasis added).

The ALJ also improperly concluded that Dr. Sobol's prescription of "only minimal conservative treatment" was inconsistent with Dr. Sobol's opinion that Plaintiff was unable to do sedentary work.  As elaborated above, Dr. Sobol has recommended invasive medical treatment, including surgeries to Plaintiff's right thumb, right ring finger, and right knee.[15]  (A.R. 317, 321, 324-29, 419.)  Taking into consideration such course of recommended treatment, the fact that Dr. Sobol did not prescribe stronger medication (*e.g.*, narcotic painkillers) failed to meet the standard of "specific, legitimate" reason for discrediting Dr. Sobol's findings.

Finally, the Court notes the lengthy duration of Dr. Sobol's treating relationship with Plaintiff, which began in January 2, 1997.  (A.R. 403.)  Although Plaintiff did not receive treatment from Dr. Sobol from February 8, 1997 to, September 19, 2001, Plaintiff received consistent treatment from Dr. Sobol (*i.e.*, approximately once every

---

[15]  Although Plaintiff followed Dr. Sobol's recommendation in receiving right thumb and ring finger trigger releases, Plaintiff declined surgery to his right knee.  (A.R. 317, 321, 324-29, 419.)

month) after that four and a half-year hiatus.[16]  (A.R. 259-61, 313-58, 377-95, 403, 419-20.)   Given Dr. Sobol's extensive treatment relationship with Plaintiff, his findings were entitled to greater consideration.  20 C.F.R. § 404.1527(d)(2)(i),(ii)(weight accorded to a treating physician's opinion dependent on length of the treatment relationship, frequency of visits, and nature and extent of treatment received).

The ALJ's reasons for rejecting Dr. Sobol's opinion were not supported by substantial evidence in the record.  Accordingly, this case must be remanded for further administrative proceedings.  On remand, the ALJ shall re-evaluate Dr. Sobol's opinion, providing reasons, if they exist, for discrediting the doctor's opinion that are specific and legitimate, in accordance with the requisite legal standard.

**C.   Plaintiff's Request For A Different ALJ Lacks Merit.**

There is a presumption that administrative law judges are unbiased, which can be rebutted by showing a conflict of interest or some other specific reason for disqualification.  Schweiker v. McClure, 456 U.S. 188, 195, 102 S. Ct. 1665, 72 L. Ed. 2d 1 (1982).  However, it may be necessary to assign a different ALJ on remand, if the previous ALJ has been shown to be biased against a physician so that he/she could not fairly assess the evidence.  *See* Reed v. Massanari, 270 F.3d 838, 845 (9th Cir. 2001)(assigning case to a different ALJ on remand where the

---

[16]    As noted above, from February 8, 1997 to September 19, 2001, Plaintiff received treatment from Drs. Thomas Kim and William Kim. (A.R. 316.)

ALJ denied the claimant's request for a consultative examination because the ALJ mistrusted, based on prior experience, the evaluations of the only specialists available to do the consultative examination).

In connection with Plaintiff's contention that the ALJ improperly dismissed his treating physicians' opinions, Plaintiff contends that the ALJ's comments concerning the treating physicians indicated an "inappropriate bias" against worker's compensation medical providers. (JS at 34.)  Specifically, the ALJ, in adopting the opinion of Dr. Gurvey and rejecting that of Dr. Sobol, noted that Dr. Gurvey was "an objective third party who [had] no personal or financial stake in the outcome of [Plaintiff's] worker's compensation or Social Security claims," but that Dr. Sobol was "[Plaintiff's] advocate for worker's compensation and his job [was] to support the claim for such benefits as well as Social Security benefits." (A.R. 26.)

The Court acknowledges that the ALJ's comment that Dr. Sobol's assessments may be less reliable was not a legitimate reason for rejecting Dr. Sobol's opinion. *See* Reddick, 157 F.3d at 725-26. However, Plaintiff fails to show that the statement was tantamount to showing that the ALJ was so biased against Plaintiff that she could not fairly assess the evidence. *See* Reed, 270 F.3d at 845. Unlike in Reed, where the ALJ denied the claimant's request for a consultative examination solely because the ALJ mistrusted the examiner, the ALJ, in the instant case, did not ignore Dr. Sobol's findings based on her mistrust. *See id.* Rather, the ALJ's comment was one of several other

reasons stated for discounting Dr. Sobol's opinion.[17]   The ALJ merely provided a reason that failed to satisfy the proper legal standard for rejecting the doctor's opinion.   This fails to show that the ALJ is incapable of fairly assessing Dr. Sobol's opinion.

In addition, Plaintiff's contention that the ALJ was biased against Dr. Curtis is similarly meritless.   The ALJ noted that Plaintiff "was seen by Dr. Curtis, a plaintiff's worker's compensation psychiatrist, in December 2002."   (A.R. 27.)   Unlike the treatment of Dr. Sobol's opinion, no purportedly biased remarks were made in connection with the relationship between Plaintiff and Dr. Curtis.   (A.R. 27.)   However, Plaintiff appears to allege that because the ALJ improperly suggested that Dr. Sobol was unreliable, partly due to his relationship with Plaintiff as a worker's compensation physician, the ALJ's comment that Dr. Curtis was Plaintiff's worker's compensation psychiatrist similarly denoted improper bias against Dr. Curtis by the ALJ. (JS at 36.)   Such allegations are speculative and fail to show actual bias.   *See* Bunnell v. Barnhart, 336 F.3d 1112, 1114 (9th Cir. 2003)(the "appearance of impropriety" standard for recusal in 28 U.S.C. § 445(a) does not apply to ALJs, rather actual bias must be shown to disqualify an ALJ).   Moreover, at noted above, the ALJ's comment concerning Dr. Sobol's relationship with Plaintiff did not amount to an "inappropriate bias"

---

[17]   The ALJ, in rejecting Dr. Sobol's opinion, also noted that Dr. Sobol's findings were "not supported by the objective findings in the record as a whole and [were] not consistent with the other functional assessments. (A.R. 26.) Furthermore, the ALJ observed that Dr. Sobol "relie[d] almost solely on the subjective complaints as support for his extreme limitations, complaints that [the ALJ found were] not fully credible." (*Id.*) The ALJ also reasoned that the "level of treatment [was] not consistent with the alleged extreme limitations [Dr. Sobol] assessed." (*Id.*)

against Dr. Sobol.

Accordingly, the Court denies Plaintiff's request to disqualify the ALJ.

**D.   <u>Remand Is Required</u>.**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  *Id*. at 1179 ("the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings").  However, where there are outstanding issues that must be resolved before a determination of disability can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, remand is appropriate.  *Id.*

Here, for the reasons noted above, further development of the record is needed.  Hence, remand is the appropriate remedy to allow the ALJ the opportunity to remedy the above-mentioned deficiencies and errors.  *See* <u>Benecke v. McCarthy</u>, 379 F.3d 587, 593 (9th Cir. 2004)(where ALJ erred by discounting treating physicians' opinions, remand for further proceedings is appropriate if enhancement of the record would be useful); <u>Higbee v. Sullivan</u>, 975 F.2d 558, 561-62 (9th Cir. 1991)(remanding case in order to develop the record); <u>McAllister v.</u>

34

<u>Sullivan</u>, 888 F.2d 599, 603 (9th Cir. 1989)(remand appropriate to remedy defects in the record).

## CONCLUSION

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and for Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 29, 2006

_____/s/_____
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

35